## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| CITY OF WABASH, INDIANA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 3:21-cv-878 |
| v. | ) | |
| | ) | |
| AEROJET ROCKETDYNE | ) | |
| HOLDINGS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S COMPLAINT FOR DAMAGES

Plaintiff City of Wabash, Indiana (the "City"), by counsel, for its complaint against Defendant Aerojet Rocketdyne Holdings, Inc. ("Aerojet"), alleges and states:

### THE PARTIES

1.      The City is a municipality organized under the laws of the State of Indiana located in Wabash County, Indiana, and owning real property located at One General Street, Wabash, Wabash County, Indiana (the "Property").

2.      Aerojet is a corporation organized under the laws of the State of Delaware having its principal place of business in El Segundo, Los Angeles County, California.

### JURISDICTION AND VENUE

3.      This court has personal jurisdiction over the City and Aerojet because they do and have done business in Indiana and the actions giving rise to this complaint were committed by Aerojet in Indiana and those actions have caused harm to the City.

4.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 because Count I arises under federal law; similarly, this court has subject matter jurisdiction

over this action pursuant to 28 U.S.C. §§ 1367 because Count II is related to Count I since it arises from the same common nucleus of operative facts.

5.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred, and a substantial part of property that is the subject of the action is situated, in this judicial district.

## NATURE OF THE CASE

6.      This lawsuit asserts claims under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607(a)(4)(B) *et seq*. ("CERCLA"), and Indiana's Environmental Legal Action Statute, Indiana Code §§ 13-30-9-1 *et seq*. (the "ELA"), for costs incurred and to be incurred by the City in responding to the release of hazardous substances and petroleum at the Property that poses a risk to human health and the environment.

## I.      The General Tire & Rubber Company

7.      The General Tire & Rubber Company ("General Tire") began operating at the Property in approximately 1936.

8.      Upon acquiring the Property, General Tire outfitted the Property and the on-site building to produce rubber products for the automotive industry.

9.      During the Second World War, General Tire produced rubber products for the defense industry.

10.     By 1948, General Tire had added additional building structures to the main plant including a warehouse building, a paint warehouse, and a rubber cement facility.

11.     In the 1950s and 1960s, General Tire added a poured-foam product line to its operations and produced gas masks, girdles, and rubber linings for missiles and warheads.

12.     During General Tire's operations at the Property, it purchased, used, handled, stored, and disposed of products containing the hazardous substances now contaminating the Property.

13.     For example, on February 19, 1969, the Indiana State Board of Health discovered 20 to 30 drums of hazardous substances at a nearby farm that were generated at by General Tire at the Property.

14.     On February 21, 1969, the Wabash County Board of Health reported to the Industrial Waste Section of the Indiana State Board of Health that "General Tire and Rubber ha[d] a weekly output of several hundred gallons of hazardous waste per week."

15.     One such hazardous waste was trichloroethylene ("TCE"), a chlorinated solvent used in degreasing operations.

16.     General Tire reported to the Wabash County Board of Health on February 17, 1975, that it operated multiple degreasers at the Property and that each degreaser had a sump.

17.     The degreasers, and their sumps, led to releases of hazardous substances at the Property.

18.     On February 28, 1975, the State of Indiana notified Lloyd Ericson, of General Tire, regarding a TCE spill that occurred "into the Wabash sanitary sewer system."  According to the State of Indiana, "[i]t was determined that the problem developed as a result of a leaking [TCE] pump packing. The leak allowed solvent to enter a ground water sump which is subsequently pumped to the sanitary sewer."

19.     The releases of hazardous substances at the Property continued.

20.    On March 6, 1979, General Tire located a toluene spill that effected several homes south of the plant.  In addition, the city sewage treatment plant detected "heavy concentrations of toluene."

21.    The cause, according to General Tire, was a leak in the line between an above ground storage tank ("AST"), where General Tire found toluene in the sand beneath the pipe down to bedrock.

22.    In the 1980s, General Tire continued to use hazardous substances and generate hazardous waste at the Property.

23.    For example, a June 24, 1980, *Notification of Hazardous Waste Activity* from prepared by General Tire and transmitted to the United States Environmental Protection Agency (the "EPA") stated that General Tire generated halogenated solvents waste used in degreasing; in addition, General Tire generated TCE, 1,1,1-trichloroethane, methyl-benzene, and dimethyl-benzene waste at the Property.

24.    Again on May 13, 1981, General Tire notified the EPA, through a subsequent *Notification of Hazardous Waste Activity* form, that it generated halogenated solvent waste used in degreasing; in addition, General Tire generated TCE, 1,1,1-trichloroethane, and spent non-halogenated solvent waste, including toluene and methyl ethyl ketone, at the Property.

25.    General Tire's on-site degreasers were large enough that they were identified as "emitters" in its July 27, 1981, Air Permit 85-06-85-0129.

26.    On September 28, 1981, General Tire requested approval from the State Board of Health to dispose of residue from its paint spray booths, identified as lead contaminated waste.

27.    General Tire's use of hazardous substances and generation of hazardous waste continued to increase.

4

28. This increased waste generation led to General Tire's September 3, 1982, *Form 3510-3* that established its status as a Resource Conservation and Recovery Act ("RCRA") Treatment Storage and Disposal ("TSD") facility.

29. In that form, the process design capacity was amended to include a 4,000-gallon storage tank for holding waste TCE.

30. Similarly, the total estimated annual quantity of hazardous waste stored at the Property increased from 59,200 pounds to 63,900 pounds.

31. As General Tire increased its generation of and storage capacity for hazardous substances, it increased its disposition of that waste.

32. On September 16, 1982, General Tire informed the State of Indiana Environmental Management Board that it intended to dispose of approximately 2,000 gallons of TCE.

33. In the meantime, the EPA continued its review of General Tire's application for RCRA TSD status.

34. As part of its December 23, 1982, *RCRA Part A Permit Application Review*, EPA employee Karl Klepitsch, the Chief of the Waste Management Branch, wrote to B.G. Constantleos, the Director of Waste Management Branch, stating that General Tire generated waste in the form of used TCE, that General Tire wants to add a 4,000-gallon tank to its design capacity to hold the TCE, and that the EPA should allow General Tire to add the 4,000 gallons to its design storage capacity.

35. General Tire was granted status as a RCRA TSD and it was allowed to expand its TCE storage with the 4,000-gallon TCE AST.

36.     As evidenced by requests for disposal from General Tire to the State Board of Health from January 7, 1983 and August 9, 1983, General Tire continued to generate and dispose of residue from spray booths, identified as lead contaminated waste and toluene.

## II.     GenCorp. and Diversitech General

37.     In 1984, General Tire changed its name to GenCorp.

38.     Beginning in 1984, the GenCorp. plant at the Property was operated by "Diversitech General Group Operating Group," ("Diversitech"), a division of GenCorp.

39.     Diversitech and GenCorp. continued the production of vibration control products and extruded rubber products at the Property; and in doing so, GenCorp and Diversitech continued to use hazardous substances and generate hazardous waste at the Property.

40.     On January 22, 1985, GenCorp and Diversitech requested authorization from the State Board of Health to dispose of 150 55-gallon drums of residue from the spray booths, that was identified as lead contaminated waste.

41.     At this time, the impact of General Tire's historical use and disposal of hazardous chemicals began to surface.

42.     A February 6, 1985, EPA assessment report for a nearby landfill operated by General Tire noted that General Tire disposed of TCE, toluene, lead, and PCBs in that open dump.

43.     The on-site and off-site impacts of GenCorp.'s and Diversitech's operations were noted in a November 14, 1985, Ecology and Environment, Inc., site inspection.

44.     Ecology and Environment detected toluene and chlorinated solvent impacts in water samples from four off-site residential wells and from a production well located at the Property.

45.     Results from the on-site production well showed 22 micrograms per liter of vinyl chloride, 40 micrograms per liter of trichloroethene, and 20 micrograms per liter of toluene.

46.     Impacts in the off-site residential wells were as high as 390 micrograms per liter for vinyl chloride, 3,700 micrograms per liter of 1,2-dichloroethene, and 7,600 micrograms per liter of TCE.

47.     Ecology and Environment also collected six on-site soil samples and one background soil sample from locations on the Property and from a park directly to the south.  Those samples showed significant impacts from chlorinated solvents, toluene, and RCRA heavy metals. This included significant impacts from copper (8,470mg/kg), lead (4310 mg/kg), and zinc (4,390 mg/kg).

48.     In the mid-1980s, Diversitech and GenCorp. clearly understood the impact of their operations.

49.     A December 3, 1985, office memorandum from the Indiana State Board of Health stated that "Diversitech personnel admit that there was a toluene leak and they had no idea how much leaked. They felt that the leak was the cause of the contamination in the well (offsite residential) and that it probably occurred over a long period of time."

50.     Despite the knowledge of the impacts of their operations, GenCorp. and Diversitech failed to adhere to regulations regarding the use, storage, and disposal of hazardous waste.

51.     On January 10, 1986, as the result of a November 21, 1985, inspection, the Indiana Department of Environmental Management ("IDEM") sent Diversitech a *Notice of Violation*.

52.     It noted the following violations of RCRA and 320 IAC 4.1 pertaining to the operations at the Property:

>    (1)   320 IAC 4.1-16-4 Diversitech did not have a detailed waste analysis plan on file at the facility.

7

(2)  320 IAC 4.1-16-6 Diversitech did not address the inspection of safety and emergency equipment in the inspection schedule.

(3)  320 IAC 4.1-23-5 Containers are not inspected weekly for leaks and deterioration.

(4)  320 IAC 4.1-24-4 Required daily inspections of tank levels are not conducted.

(5)  320 IAC 4.1-16-6 The inspection log does not contain the date and nature of any repairs or remedial actions.

(6)  320 IAC 4.1-16-7 Personnel training records do not include a description of personnel training specifically including the implementation of a contingency plan.

(7)  320 IAC 4.1-17-7 The contingency plan does not describe arrangements agreed to by local police departments, fire departments, hospitals, contractors, and state and local emergency response teams.

(8)  320 IAC 4.1-18-3 The contingency plan does not include the location of emergency equipment.

(9)  320 IAC 4.1-19-4 A description and the quantity of each hazardous waste received and the method(s) and date(s) of each waste's storage is not in the operating record.

(10)  320 IAC 4.1-19-4 The operating record does not include records and results of inspections of tank levels for waste TCE.

(11)  320 IAC 4.1-16-5 Security measures do not include 24-hour surveillance or an artificial or natural barrier around the active portion(s) of the facility and a means to control entry.

(12)  320 IAC 4.1-17-3(c) Lack of spill control equipment in the drum storage areas.

(13)  320 IAC 4.1-14-3 Manifest(s) does not contain the proper EPA waste number for toluene shipments.

(14)  320 IAC 4.1-9-5 Start of accumulation period was not clearly marked on each container found in the generator accumulation area.

53.   Diversitech General was required to, within 30 calendar days of receipt of the violation letter, to meet the following requirements:

(1)  Prepare a detailed waste analysis plan and keep it on file at the facility.

(2)  Inspect all safety and emergency equipment.

(3)  Inspect containers weekly for leaks and signs of container deterioration.

(4)  Required daily and weekly inspections shall be conducted.

(5)  Include the date and nature of any remedial actions on the inspection log.

(6)  Revise personnel training records to include a description of personnel training.

(7)  Revise contingency plan to describe arrangements agreed to by local police departments, fire departments. hospitals, contractors, and state

and local emergency response teams. Submit a copy of the revised plan to IDEM.

(8)   Revise contingency plan to include the location of the emergency equipment. Submit a copy of the revised plan to IDEM.

(9)   The operating record shall contain a description and the quantity of each hazardous waste received and the method(s) and date(s) of each waste's storage.

(10)  Include facility inspections in the operating record.

(11)  Security measures must include 24-hour surveillance or an artificial or natural barrier around the facility with a means to control entry.

(12)  Provide spill control equipment.

(13)  Submit a completed, corrected copy of the manifest(s).

(14)  Mark the start of the accumulation period on each container.

(15)  Submit a revised Part A to identify the addition of a new drum storage pad that has already been constructed.

54.   Diversitech and GenCorp.'s generation of hazardous substances continued at the Property.

55.   On January 28, 1986, Diversitech wrote to IDEM explaining that the reason for its modification to the application for its *Part A Form 1 and 3* was "to show additional storage area" and to accommodate additional storage for "drums of [TCE] waste." This is because the "waste contains a high percentage of water and the water would freeze during the winter months, therefore necessitating the placement of the [TCE] waste in drums for disposal purposes."

56.   Further, on April 22, 1986, Diversitech submitted a *RCRA Hazardous Waste Manifest* for disposal of 350 gallons of TCE and water.

57.    On April 28, 1986, Diversitech submitted another *RCRA Hazardous Waste Manifest* for the disposal of 500 gallons of toluene, 200 gallon of cement liquid, and 1,050 gallons of solvent.

58.   The amount of hazardous waste storage at the Property also increased.

59.   On September 18, 1986, IDEM approved an increase in Diversitech's hazardous storage container capacity from 5,500 gallons to 11,000 gallons.

60.     As part of that increased capacity, Diversitech created a list of the hazardous substance waste streams which included TCE and toluene.

61.     Diversitech further estimated that it had 7,200 gallons of TCE on-site.

62.     IDEM conducted a February 17, 1988, *Generator TSD Inspection* of the GenCorp.'s and Diversitech's storage operations.

63.     As part of that inspection, IDEM noted that the Property was a large quantity generator of hazardous waste, and that the degreasing operations at the Property generated waste TCE.

64.     During that inspection, IDEM found the following violations: inadequate aisle space, no waste analysis plan on file at the facility, operator inspections are not conducted, deficiencies in personnel training records, and deficiencies in the contingency plan and operation record.

65.     IDEM's inspection was quickly followed with a February 23, 1988, violation letter noting the following RCRA violations:

(1)     320 IAC 4.1-16-4 Diversitech does not have detailed waste analysis plan at the facility.
(2)     320 IAC 4.1-16-6 Diversitech does not conduct required inspections.
(3)     320 IAC 4.1-16-6 Diversitech has not developed a written inspection schedule.
(4)     320 IAC 4.1-16-6 Areas subject to spills are not inspected
(5)     320 IAC 4.1-16-6 Diversitech does not record inspections in an inspection log.
(6)     320 IAC 4.1-16-7 Records of personnel training have not been maintained.
(7)     320 IAC 4.1-16-7 Personnel have not received required training.
(8)     320 IAC 4.1-16-7 Personnel training records do not include the name of the employees filling each job title.
(9)     320 IAC 4.1-16-7 Personnel training records do not include a description of personnel training.
(10)    320 IAC 4.1-18-3 The contingency plan does not list the addresses of all persons who may assume responsibility as emergency coordinators.

(11)  320 IAC 4.1-18-3 The contingency plan does not include the quantity of all emergency equipment listed, physical description of each item on the list, and an outline of equipment capabilities.

(12)  320 IAC 4.1-18-3 The contingency plan does not contain the signal to be given to start the plant evacuation.

(13)  320 IAC 4.1-19-4 The location of each hazardous waste within the facility is not maintained in the operating record.

66.    These violations were, in many cases, identical to those from IDEM's January 10, 1986, notice of violation.

67.    On March 16, 1988, the EPA issued a report from its own inspection of the Property.  In that report, the EPA identified a toluene storage tank at the Property that was connected to the plant by an underground pipe.

68.    The EPA also observed a ditch that flows from the Property along the eastern side of the plant building, past a 3,000-gallon TCE tank, that emptied into Charlie Creek.

69.    As part of its inspection, the EPA completed a March 16, 1988, *EPA Potential Hazardous Waste Site Worksheet* that listed "feed stocks" of hazardous chemicals such as TCE and toluene, and it also lists wastes as 1,1,1-trichloroethane, 1,2,4-trichlorobenzene.

70.    That same form identified a 10,000-gallon toluene tank, 600,000-gallon fuel oil tank, and a 3,000-gallon TCE tank.

71.    On May 11, 1988, GenCorp wrote to the EPA to address certain questions about GenCorp.'s operations at the Property.

72.    In that letter, GenCorp noted that TCE, toluene, and xylene were used at the Property.

73.    GenCorp identified the following waste streams for its operations: (1) solvent based paint waste that includes concentrations of xylene, methyl ethyl ketone, and perchloroethtlyne; (2)

flow coater waste of toluene; (3) degreaser waste of TCE; (4) parts cleaner waste of TCE; and (5) laboratory waste of perchloroethylene, xylene, methyl ethyl ketone, toluene, and TCE.

74.     On June 20, 1988, Dick Joseph of GenCorp. notified IDEM that GenCorp. intended to undergo closure of its TSD operations, in lieu of submitting a Part B certification for its TSD operations.

75.     As part of this closure, on August 31, 1988, IDEM issued an *Office Memorandum* regarding the RCRA Closure of the GenCorp. "Wabash Site" for the 4,000-gallon TCE storage tank and the 11,000-gallon toluene and other hazardous waste storage area.

76.     On October 11, 1988, GenCorp. notified IDEM of the details of the closure of the 4,000-gallon hazardous waste storage "vessel" in a closure report, and committed to replace that AST with the current 11,000-gallon hazardous drum storage area which would be converted into a temporary hazardous waste storage area for a period not to exceed 89 days.

77.     In that same report, GenCorp. listed the hazardous waste generated at the Property as TCE waste from degreasers, toluene-urethane waste from coating process, filters and residue from the paint booth identified as flammable liquid waste, water based paint residue from the booth, "lab solvent" that is an accumulation of organic solvents from the laboratory, and waste from part cleaning operations identified as waste TCE.

78.     In GenCorp.'s discussion of the Hazardous Waste Management Units at the Property, it explained that:

> [TCE] waste [is] generated as a result of cleaning the degreasers. There are three degreasers at the plant. One degreaser is cleaned once per year. Approximately six drums of waste are generated during the cleaning operation. Another tank is cleaned every four-five months and generates approximately six drums of waste per cleaning. The remaining degreaser is currently cleaned every six weeks and generates approximately two to four drums of waste. This waste is normally sent to a recycler. The waste is moved to the storage within 24 hours after being place in drums.

Toluene-Urethane waste. This waste is generated at the coating operation. Several gallons of waste is usually generated per working day. When the drum is filled, the waste is removed to the storage area. There is considerable variation from day to day in the amount of waste generated, generally it averages two 55 gallon drums per week.

Filters and residues from paint booths. Waste generated daily as the filters are replaced and the filters and overspray placed in drums. Two drums are generated every month as a rule and sent to the storage area upon filling.

Water based paint residue is used infrequently. In the past years, only two drums of waste were generated. The waste is sent to the waste storage area in 55 gallon drums and disposed to an incinerator.

Lab solvent waste. This waste is an accumulation of various organic solvents; the waste is placed in 10-gallon safety cans. The cans when full are sent to the storage area where they are emptied into 55 gallon drums maintained for that purpose. The waste is either disposed to an incinerator or to the fuels program.

Organic solvent waste used in part cleaning operations. This waste is accumulated daily and placed into a 55-gallon drum. The drum when filled is sent to the hazardous waste storage area. Approximately one drum of waste is generated per month. The waste is disposed to a recycler as waste 1,1,1, Trichloroethane.

79.     As part of that closure report, a *RCRA and Spill Prevention, Control and Countermeasure ("SPCC") Inspection* report was included and listed the Property's substance storage containers, including a 12,000-gallon AST of toluene, a 3,000-gallon AST of trichloroethylene, and a 4,000 gallon AST of waste trichloroethylene.

80.     The report further described that "the hazardous waste storage area is located northeast of the main production building. The hazardous waste drum storage area is 36' x 38' and is roofed with open sides. The floor is a cement slab and is diked to hold several times the amounts contained in the 55 gallon drums. Adjacent to the drum storage area is a metal 4,000 gallon [AST] used to store waste [TCE]. The entire storage rea is surrounded by a 95'x55' fence. The fence is seven feet high and entree is gained through a locked gate."

81.     GenCorp. reported that, in that hazardous waste storage area, there was estimated to be 56 drums of flammable spent non-halogenated solvents that included toluene and methyl ethyl ketone, 16 drums of hazardous waste lead contaminated paint sludge, eight drums of cement containing flammable spent non-halogenated solvents that included toluene and methyl ethyl ketone, and 4,000 gallons of TCE.

82.     On November 16, 1988, GenCorp. informed IDEM that the waste TCE tank was drained and the waste TCE was sent offsite.

83.     As part of that closure, GenCorp. noted that there was waste TCE sludge on the outside of the waste TCE tank.

**III.     Diversitech absorbed by GenCorp.**

84.     On November 30, 1988, GenCorp. notified the EPA that it intended to absorb Diversitech and that GenCorp. would continue to own and operate at the Property.

85.     GenCorp. continued its operations and the use of hazardous substances at the Property.

86.     When GenCorp. submitted its 1988 *Form R Toxic Release Inventory* ("Form R") reporting for the Property, it identified the waste streams of methyl ethyl ketone, zinc, xylene, TCE, 1,1,1 trichloroethane (methyl chloroform), and toluene.

87.     A January 5, 1989, *Screening Site Assessment* for the EPA by Ecology and Environment identified the continued presence of the 3,000-gallon capacity TCE AST located northeast of the facility's main primary building, a 600,000-gallon capacity fuel oil AST located east of the plant, and a 12,000-gallon capacity toluene AST located west of the plant.

88.     On January 13, 1989, IDEM required that GenCorp. sample the tank area of the former 4,000-gallon waste TCE tank and clean its former TSD containment area.

89.     On October 11, 1989, GenCorp responded to IDEM's requirement to sample the former 4,000-gallon waste TCE tank with results showing that there was 82 parts per microgram of TCE in the area surrounding the closed tank.

90.     On November 29, 1989, IDEM approved the "closure" of the 4,000-gallon waste TCE storage tank and the TSD storage area.

91.     Despite the closure of the TSD storage area, GenCorp. continued to generate significant quantities of hazardous waste at the Property.

92.     GenCorp.'s February 26, 1990, *Tier Two Emergency and Hazardous Chemical Inventory* listed TCE as located in at least two areas at the Property.

93.     Similarly, GenCorp.'s February 26, 1990, *Hazardous Waste Biennial Report for 1989* stated that GenCorp.'s operations at the Property were as a large quantity generator of hazardous waste, including the following: 3,220 gallons of TCE, 3,080 gallons of toluene, and 2,145 gallons of 1,1,1, trichloroethane.

94.     Further, GenCorp.'s June 29, 1990, *EPA Toxic Chemical Release Inventory Report* included *Form R*s for the following hazardous substances: zinc, methyl ethyl ketone, toluene, 1,1,1 trichloroethane (methyl chloroform), TCE, and xylene.

95.     GenCorp.'s use of hazardous substances led to additional violations of environmental regulations.

96.     On November 16, 1990, IDEM issued another violation letter to GenCorp.

97.     That letter noted the following violations of 329 IAC 3 pertaining to GenCorp.'s operations:

> (1)   329 IAC 3-16-7 The facility's personnel training records do not include detailed job descriptions containing the required skills, education, or other qualifications and duties of the personnel assigned to a hazardous waste management position. The training records do

not (1) document the annual review of training for facility personnel, (2) include all training records of current personnel, or (3) include records for the pest three (3) years for former employees.

(2)   329 IAC 3-18-3 The facility has not identified a replacement and emergency coordinator for the former designee who vacated the position in early June 1990.

(3)   329 IAC 3-19-6 The facility's 1989 biennial report does not match the manifested amounts the facility had shipped.

(4)   329 IAC 3-23-4 The container accumulation area does not afford proper aisle spacing.

98.   GenCorp. had 30 days to comply with the following requirements:

(1)   Submit personnel training records that document detailed job descriptions containing the required skills, education, or other qualifications and duties of the personnel assigned to the position. In addition, document the annual review of training received by facility personnel.

(2)   The facility's contingency plan shall clearly identify the employee(s) who has the authority to act as an emergency coordinator in the absence of the current designated person.

(3)   Upon submitting its biennial reports, the facility shall ensure that all information recorded matches the information on the manifests. Submit a revised biennial report to IDEM.

(4)   Containers in the accumulation area shall be arranged so that the aisles between containers are at least two and one-half (2 1/2) feet wide.

99.   After this violation, GenCorp. continued to use hazardous substances and generate hazardous waste at the Property.

100.   GenCorp.'s February 8, 1991, *Tier Two Emergency and Hazardous Chemical Inventory* again listed TCE as used at the Property.

101.   Its March 4, 1991, *VOC Usage Worksheet* stated that GenCorp. purchased 91.5 tons of TCE, of which 9.45 tons were disposed of as waste and 82.05 tons were disposed of through the "stack."

102.   GenCorp.'s June 26, 1991, *EPA Toxic Chemical Release Inventory Report Form* again contained EPA *Form Rs* for zinc, methyl ethyl ketone, toluene, 1,1,1 trichloroethane (methyl chloroform), and TCE.

103.    Again, its February 27, 1992, *Tier Two Emergency and Hazardous Chemical Inventory* listed TCE as used at the Property.

104.    Its June 10, 1992, *Emergency and Hazardous Chemical Inventory* listed TCE and 1,1,1 trichloroethene as hazardous substances in the inventory at the Property.

105.    GenCorp.'s March 1, 1993, *Tier Two Emergency and Hazardous Chemical Inventory* again listed TCE as used at the Property.

106.    In February 24, 1994, its *Tier Two Emergency and Hazardous Chemical Inventory* increased the TCE usage at the Property from two to three locations.

107.    GenCorp.'s use of hazardous substances and generation of hazardous waste continued at the Property.

108.    On February 26, 1996, a transfer of existing operation permits included Air Permit OP-06-85-0129, and three degreasers.

109.    On March 19, 1996, during GenCorp's ownership, British Tire and Rubber ("BTR") began leasing a portion of the Property and was recognized as a separate large quantity generator of hazardous waste, including spent halogenated solvents used in degreasing, including TCE and 1,1,1-trichloroethane.

110.    In addition to BTR's operations, GenCorp. continued to use hazardous wastes in its operations at the Property.

111.    For example, GenCorp.'s July 16, 1996, *Form R* contains methyl ethyl ketone, toluene, 1,1,1 trichloroethane, TCE, xylene, and zinc.

112.    In 1997, GenCorp. began closing its bulk storage ASTs.

113.    On February 13, 1997, Pratter Environmental Services, Inc. ("Pratter") issued an *Aboveground Storage Tanks Closure Report and Environmental Assessment* for the Property.

114.    As part of that report, Pratter outlined the historical use and closure of two TCE ASTs and a toluene AST.

115.    According to Pratter's report, the toluene was stored in a 12,000 gallon AST that stood vertically on a concrete pedestal with an approximately 3 foot of concrete with a dike. Toluene was piped above-ground from the AST into the northern wall of the building. Piping then traveled into the ground and extended into the facility. There was a product unloading pad immediately adjacent. During closure, the concrete from beneath the toluene AST was used as backfill material as part of the site restoration activities in the fuel oil area.

116.    The TCE ASTs were located at the northeast portion of the facility. TCE was stored in two 4,000 gallon ASTs and a small open top AST that also periodically held TCE. The larger ASTs stood vertically and each was placed in the center of its own concrete dike. The TCE was transferred from the ASTs to the facility through above-ground piping along a metal beam.

117.    During closure of the TCE ASTs water had to be removed from within the dike areas. Rain water had accumulated in the dikes and it was approximately one foot deep. The water was sampled for laboratory analysis before it was removed; the results indicated the presence of TCE at concentrations of 220 parts per billion and 32 parts per billion. After a second rain event, water was evacuated and the concrete walls and floor were destroyed and removed to the fuel oil AST area to be used as backfill. Once the concrete had been removed, it was apparent that the dikes had been constructed on top of the very shallow bedrock surface. Therefore, soil sampling for laboratory analysis was not performed in this area as originally planned.

118.    After the closure of the toluene and TCE ASTs, GenCorp. continued to use hazardous substances at the Property.

18

119.     On February 18, 1997, GenCorp.'s *Tier Two Emergency and Hazardous Chemical Inventory* sheet indicated that the facility used toluene and TCE.

120.     In 1998, after approximately two years of operations at the Property, BTR indicated that it would move its operations off-site in August 1998.

121.     In April 1998, before BTR's scheduled August 1998 departure, GenCorp. conducted an environmental audit of all of the operations at the Property.

122.     That report indicated that the facility qualified as a large quantity generator of hazardous waste.

123.     According to that report, hazardous wastes were accumulated near the points of origin in 55-gallon drums located in clearly marked areas of the plant. The drums are transferred to an outside waste storage building prior to off-site disposal; hazardous waste manifests were prepared for all hazardous waste shipments.

124.     The audit found deficiencies in a number of GenCorp's operations at the Property; these included (1) a lack of documentation or evidence of current training was found during the audit as required by RCRA, the Clean Water Act–SPCC, and Department of Transportation–Hazardous Material regulations; (2) discrepancies in in the historical hazardous waste management file and SPCC inspection reports with observations made by the audit team at the time of the audit; and (3) issues relating to the labeling of RCRA and non-RCRA waste.

## IV.     GDX Automotive

125.     In 2001, GenCorp. acquired Draftex and merged its operations at the Property with Draftex to form GDX Automotive, Inc. The Property became part of the GDX Automotive Division of GenCorp. and GDX Automotive continued to produce extruded rubber products.

126. On February 21, 2003, GDX Automotive wrote to IDEM stating that it was a large quantity generator of hazardous waste at the Property.

127. In 2004, GenCorp Inc. sold its equity interest in GDX Automotive to GDX Holdings LLC. GDX Holdings LLC was owned by Cerberus Capital Management, L.P.

## V.     Environmental Investigations

128. Environmental reports conducted by GenCorp. and other stakeholders have confirmed the impacts of GenCorp.'s ownership and operations of the Property.

129. On August 2004, RMT, Inc., conducted a *Phase I Environmental Site Assessment* of the GDX Automotive operations at the Property.

130. The assessment identified six recognized environmental concerns ("REC") at the Property:

(1) The operation of the six storage tanks and pits: two 4,000-gallon capacity ASTs containing TCE, one 12,000-gallon capacity AST containing toluene, one 600,000-gallon capacity fuel oil AST, and two former concrete containment pits that housed TCE-containing degreasers.
(2) The 1979 toluene spill.
(3) The facility's various floor drains are connected to sanitary and storm sewer lines.
(4) That sheet flow storm water runoff might carry suspended carbon black off-site.
(5) That coal and coke were historically used at the facility as a fuel source for the powerhouse and boilers.
(6) The complex assortment of trenches, sumps, and other subgrade structures in the vicinity of the former boiler house.

131. An August 2, 2010, Indiana Brownfields Program letter again identified the two 4,000-Gallon capacity TCE ASTs, the 12,000-gallon toluene AST, the two TCE degreaser contaminant pits in the east end of the site, and the 1979 historical toluene release as RECs.

132. On November 16, 2010, IWM completed a Phase II Site Investigation at the public properties surrounding the Property; that Phase II documented groundwater concentrations of TCE

and cis-1,2- dichloroethene in excess of the applicable closure levels at five off-site monitoring wells located in the park area immediately south of the Property.

133.    In addition, TCE was detected in a monitoring well in excess of the applicable closure levels just south of the former toluene storage tank.

## VI.    GenCorp. is a Responsible Party for the Property

134.    On March 15, 2013, IDEM issued a *Special Notice of Liability* to GenCorp.

135.    In that notice, IDEM informed GenCorp. that it determined that a release of hazardous substances at the Property existed, and that GenCorp. was liable for response actions and costs at the Property.

136.    IDEM determined that GenCorp. is a responsible party with respect to the Property because GenCorp. was an owner and operator of the Property at the time of the disposal or release of contaminants and arranged for treatment or disposal of hazardous substances at the Property.

137.    In its May 6, 2013, response to IDEM, GenCorp. outlined its operations at the Property.

138.    GenCorp. confirmed that the Property became operational in approximately 1937, and that the plant manufactured rubber industrial products primarily for the automotive industry.

139.    As part of its response, GenCorp. acknowledged that it operated three vapor degreasers that used TCE.

140.    According to GenCorp.:

> Two of the degreasers were open top and one was enclosed and each was equipped with a dedicated solvent recovery unit. The larger open top degreaser was used to remove rust from hay rollers and the small open top degreaser was used to remove paint from fixtures and rubber and oil/grease from miscellaneous parts. The enclosed degreaser was used to remove oil/grease from motor mounts.

141.    GenCorp. further confirmed that it used and stored hazardous substances at the Property including TCE, methyl chloroform, toluene, xylene, methyl ethyl ketone, sulfuric acid, hydrated amorphous silica, calcium oxide, carbon black, nitrogen, sulfur, zinc oxide, aqua ammonia, chlorine, #6 fuel oil, hydrated aluminum silicate, magnesium silicate, white mineral oil, naphthenic oil, aromatic oil, and paraffinic oil distillate.

142.    GenCorp.'s response further confirmed that it used and maintained ASTs for the storage of (1) toluene (12,000 gallon tank), (2) TCE (4,000 gallon tank), and (3) fuel oil (600,000 gallon tank).[1]

**VII.    GenCorp. begins to investigate the Property and becomes Aerojet**

143.    On June 11, 2014, IDEM demanded that GenCorp. conduct a Further Site Investigation and Vapor Intrusion Investigation at the Property.

144.    IDEM stated that there were impacts of TCE in soil that exceed the IDEM applicable Remediation Closure Guide Screening Levels, including significant volatile organic compound impacts to the ground water that were as high as 44,400 micrograms per liter of trichloroethylene, 11,200 micrograms per liter of 1, 2-cis-dichloroethene, and 425 micrograms per liter of vinyl chloride.

145.    In April 2015, GenCorp. changed its name to Aerojet.

146.    On May 24, 2016, Aerojet submitted a comprehensive *Further Site Investigation* that alleged all on-site and off-site impacts were delineated and proposed a remediation work plan to achieve regulatory closure without significantly addressing the contamination at the Property.

_____

[1] GenCorp.'s response makes no mention of the other two TCE ASTs noted *supra*.

**VIII.   The City undertakes significant efforts to redevelop the Property to its highest and best use**

147.   In 2017, the City undertook a study into housing and redevelopment in the City, and targeted underutilized parcels, including the Property.

148.   That study identified the Property as a prime site for residential redevelopment.

149.   On November 10, 2020, the City took title to the Property.

150.   Since taking title to the Property, the City has sought to redevelop the Property to its highest and best use.

151.   As part of those efforts, the City has allocated substantial funds and taken significant actions.

152.   For instance, to date, the City has spent over $427,200.83 to redevelop the Property.

153.   In addition, the City has retained a developer, Whitestone Development (formerly known as Luckett and Farley), to redevelop the Property.

154.   Further, on April 12, 2021, the City transmitted correspondence to Ms. Lisa McCoy of IDEM's Office of Legal Counsel outlining the efforts the City has taken and will undertake to redevelop the Property.

155.   On April 12, 2021, the Wabash City Council passed a resolution committing further financial support to the redevelopment of the Property.

156.   On May 5, 2021, the Wabash Plan Commission adopted a resolution recommending  that the Property be rezoned from industrial to residential.

157.   On June 28, 2021, the Wabash City Council passed an ordinance rezoning the Property to residential.

158.   On July 6, 2021, the Wabash Redevelopment Commission considered the creation of redevelopment plans and programs for residential tax increment financing for the Property.

159.    On August 23, 2021, the Wabash City Council passed a resolution approving an agreement with the Indianapolis Housing Authority that would provide resources to prospective homeowners at sites including the Property.

160.    On October 5, 2021, the Wabash Redevelopment Commission passed a declaratory resolution approving tax increment financing and setting the redevelopment area and allocation area for the Property and also developed a residential and commercial development area plans that include the Property as a residential area.

161.    On October 6, 2021, the residential and commercial development area plans were submitted to the Wabash City Plan Commission which determined that the area plans, including the plan for the Property as a residential development, conformed to the City's master plan.

162.    On October 28, 2021, the Wabash City Economic Development Commission granted its approval of the creation of an Economic Development Target Area (EDTA) which includes within its area the Property.

163.    On October 28, 2021, the Wabash City Council passed an ordinance approving the creation of an EDTA which includes the Property in the target area.

164.    On November 2, 2021, the Wabash City Redevelopment Commission passed a confirmatory resolution approving the creation of the EDTA which includes the Property and which will authorize the use of tax increment financing to fund the development of the target area including the Property as residential housing.

165.    Provided that the remedial efforts at the Property achieve a residential cleanup level, the City anticipates that, in 2022, the plat for the Property will be finalized, it will start construction of the infrastructure at the Property, including the street, sidewalks, and utilities, and

will have conducted the clean-up of certain parts of the contamination at the Property as part of that development.

## VIV.   The City has incurred significant costs to address the contamination

166.   Since the contamination was discovered, the City has incurred, and will continue to incur, environmental costs in responding to the contamination including necessary response costs to remove and remediate the contamination.

167.   The City, by this action, seeks recovery of its response costs, as well as future response costs, incurred by it as a result of Aerojet's release of contamination at the Property.

**CLAIMS FOR RELIEF**

**Count I**

**Comprehensive Environmental Response, Compensation, and Liability Act**

168.   The City incorporates by reference paragraphs 1 through 167 above as if fully set forth herein

169.   42 U.S.C. § 9607(a)(4)(B), commonly referred to as CERCLA Section 107, reads as follows:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-
>
> (1)   the owner and operator of a vessel or a facility,
>
> (2)   any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3)   any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other part or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4)   any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for-

(A)   all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B)   any other necessary costs of response incurred by any other person consistent with the national contingency plan (…)

170.   42 U.S.C. § 9601(9) reads as follows: "The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline … or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

171.   40 CFR § 304.12 (m) reads as follows: "Potentially responsible party or PRP means any person who may be liable pursuant to section 107(a) of CERCLA, 42 U.S.C. 9607(a), for response costs incurred and to be incurred … not inconsistent with NCP."

172.   The Property which is the subject of this action is a "facility" as defined under CERCLA.

173.   Aerojet caused or contributed to the release of hazardous substances into the subsurface soil and groundwater at and around the Property and, therefore, is a Potentially Responsible Party as defined in 40 CFR § 304.12(m).

174.   Aerojet was an owner of the Property at a time of disposal and, therefore, is a Potentially Responsible Party as defined in 42 U.S.C. § 9607(a)(2) and 40 CFR § 304.12(m).

175.   Through the work conducted at and around the Property by and on behalf of the City, it has and will incur remediation costs that are consistent with the National Contingency Plan.

176.     Aerojet is liable to the City for all costs it has and will incur as a result of the subsurface soil and groundwater contamination at and around the Property.

## Count II

### Indiana Environmental Legal Action

177.     The City incorporates by reference paragraphs 1 through 176 above as if fully set forth herein.

178.     Section 13-30-9-2 of the ELA statute reads as follows:

> A person may, regardless of whether the person caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

179.     The City and Aerojet are "persons" within the meaning of the ELA statute.

180.     Aerojet caused or contributed to the release of hazardous substances into the subsurface soil and groundwater at and around the Property.

181.     The subsurface soil and groundwater contamination at and around the Property poses a risk to human health and the environment.

182.     Through the work conducted at and around the Property by and on behalf of the City, it has incurred or will incur removal and/or remediation costs.

183.     Aerojet is liable to the City for all costs it has incurred or will incur as a result of the subsurface soil and groundwater contamination at and around the Property, including the legal fees and court costs incurred by the City in bringing this action.

### PRAYER FOR RELIEF

WHEREFORE, the City respectfully requests that the Court:

1.     Enter judgment in favor of the City and against Aerojet;

27

2.      Order Aerojet to pay the City an amount that will fully and fairly compensate the City for its past and prospective damages;

3.      Order Aerojet to pay the City for its reasonable attorneys' fees and court costs of this litigation;

4.      Declare that the Aerojet is obligated to pay all costs, damages, fees, and other expenses incurred and to be incurred by the City arising from the environmental contamination at and emanating from the Property;

5.      Award the City all further relief that is just and proper.

Respectfully submitted,

s/ *David L. Guevara*
David L. Guevara, Atty. No. 26388-49
Nadine E. McSpadden, Atty. No. 25420-49
John F. Huldin, Atty. No. 35258-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone: (317) 713-3500
Email: dguevara@taftlaw.com
         nmcspadden@taftlaw.com
         jhuldin@taftlaw.com

*Counsel for Plaintiff*